UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARTIN S. McLOUTH,

        Petitioner,

                                     CASE NO. 01-CV-71573-DT
  v.                              JUDGE NANCY G. EDMUNDS
                                     MAGISTRATE JUDGE PAUL J. KOMIVES

SHERRY BURT,

        Respondent.

_____/


# REPORT AND RECOMMENDATION


*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     C.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     E.    *Right to Counsel (Substitute Counsel/Pro Se Representation)* . . . . . . . . . . . . . . . . . . . . . . 15
          1.    *Counsel's Request to Withdraw* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          2.    *Denial of Adjournment/Substitute Counsel* . . . . . . . . . . . . . . . . . . . . . . . . . 16
              a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
              b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
          3.    *Denial of Self-Representation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
              a. Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
              b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     F.    *Ineffective Assistance of Counsel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
              a. Preparation/Communication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
              b. Suppression of Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
              c. Waiver of Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
     G.    *Right to Confront the Witnesses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
     H.    *Right to Impartial Jury* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
     I.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

I.     <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.    <u>REPORT</u>:

A.     *Procedural History*

1.     Petitioner Martin S. McLouth is a state prisoner, currently confined at the Oaks Correctional Facility in Manistee, Michigan.

2.     On September 17, 1996, petitioner was convicted of three counts of first degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b, following a jury trial in the Eaton County Circuit Court.  On October 16, 1996, he was sentenced to concurrent terms of 30-50 years' imprisonment on each count.

3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, a number of claims, including claims of ineffective assistance of counsel.  The court of appeals remanded the matter to the trial court for an evidentiary hearing pursuant to *People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973).  After receiving evidence on three separate dates, the trial court denied petitioner's motion for new trial on September 11, 1998, concluding that petitioner had failed to establish that he received ineffective assistance of counsel.

4.     Thereafter, petitioner filed his brief in the Michigan Court of Appeals, raising nine claims:

    I.     WHETHER THE TRIAL COURT ERRED IN "AMENDING" DEFENDANT'S ORIGINAL, VALID JUDGMENT OF CONVICTION AND SENTENCE IN ORDER TO SENTENCE DEFENDANT ON AN ADDED COUNT AS A HABITUAL OFFENDER?

    II.    WHETHER THE TRIAL COURT ERRED IN ALLOWING "PROFILE" EVIDENCE FROM THE TREATING PHYSICIAN THAT SEXUAL ASSAULT VICTIMS OFTEN ASK TO WASH UP?

III. WHETHER THE TRIAL COURT ERRED IN ADMITTING DEFENDANT'S "DAY PLANNER," WHICH WAS NOT RELEVANT TO ANY ISSUES IN THE CASE?

IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING EVIDENCE THAT DEFENDANT ALLEGEDLY REFUSED TO GIVE A WRITTEN OR TAPE-RECORDED STATEMENT AFTER HIS ARREST?

V. WHETHER THE TRIAL COURT PLAINLY ERRED IN FAILING TO GIVE PROPER INSTRUCTIONS WHERE IT:

    A. FAILED TO GIVE A PROPER LIMITING INSTRUCTION ON SIMILAR ACTS?

    B. FAILED TO GIVE A PROPER REASONABLE-DOUBT INSTRUCTION?

VI. WHETHER A NEW TRIAL IS REQUIRED WHERE TRIAL COUNSEL:

    A. FAILED TO SEEK SUPPRESSION OF DEFENDANT'S STATEMENTS ON FIFTH AMENDMENT GROUNDS?

    B. FAILED TO SEEK SUPPRESSION OF DEFENDANT'S STATEMENTS AND PHYSICAL EVIDENCE AS ILLEGALLY SEIZED UNDER THE FOURTH AMENDMENT?

    C. FAILED TO PRESENT MEDICAL AND LAY EVIDENCE OF DEFENDANT'S DEBILITATED PHYSICAL CONDITION, WHICH WOULD HAVE CAST DOUBT ON HIS ABILITY TO HAVE COMMITTED THE CRIME AS ALLEGED?

    D. FAILED TO OBJECT TO HIGHLY PREJUDICIAL OTHER-ACTS EVIDENCE OFFERED WITHOUT THE REQUISITE NOTICE?

    E. WAS INEFFECTIVE IN CROSS-EXAMINING WITNESS JANIS KUTAS TO EXPOSE HER PRIOR INCONSISTENT STATEMENT AND TO SHOW BIAS?

    F. WAS INEFFECTIVE IN CROSS-EXAMINING PROSECUTION WITNESS JASON LINTON, THEREBY ELICITING DAMAGING EVIDENCE THAT DEFENDANT WAS ALLEGEDLY OPERATING AN "ESCORT SERVICE"?

    G. WAS INEFFECTIVE IN FAILING TO OBJECT ON PROPER

GROUNDS WHEN THE PROSECUTOR ELICITED "PROFILE" EVIDENCE FROM THE EMERGENCY-ROOM PHYSICIAN TO EXPLAIN THE COMPLAINANT'S DESIRE TO WASH UP AS PROOF OF HIS HAVING BEEN SEXUALLY ASSAULTED?

H.      FAILED TO OBJECT TO REPEATED, DAMAGING HEARSAY EVIDENCE WHICH BOLSTERED COMPLAINANT'S TESTIMONY?

I.       FAILED TO BRING DEFENDANT'S TREATING PHYSICIAN, DR. SHARD, TO TESTIFY THAT DEFENDANT WAS UNDER MEDICATION?

J.      FAILED TO PRESENT CRITICAL DEFENSE EVIDENCE THAT COMPLAINANT, WHO CLAIMED DEFENDANT WAS A VIRTUAL STRANGER, HAD CALLED DEFENDANT AT HIS MOTHER'S HOUSE?

K.     FAILED TO OBJECT TO IMPROPER AND PREJUDICIAL ARGUMENT?

L.     WAS INEFFECTIVE IN FAILING TO OBJECT TO IMPROPER INSTRUCTIONS AND FAILING TO SEEK PROPER INSTRUCTIONS?

VII.    WHETHER THE CUMULATIVE EFFECT OF THE PROSECUTOR'S MISCONDUCT DEMANDS REVERSAL WHERE THE PROSECUTOR: OFFERED HIGHLY PREJUDICIAL OTHER-ACTS EVIDENCE WITHOUT THE REQUISITE NOTICE; ELICITED IMPROPER "PROFILE" EVIDENCE; IMPROPERLY BOLSTERED COMPLAINANT'S TESTIMONY BY REPEATEDLY ELICITING DAMAGING HEARSAY EVIDENCE; PAINTED DEFENDANT AS A HOMOSEXUAL PREDATOR PREYING ON "OUR CHILDREN"; ARGUED THAT THE COMPLAINANT WAS NOW RUNNING TO THE JURY FOR "HELP" AND IDENTIFIED LESSER-INCLUDED INSTRUCTIONS AS HAVING EMANATED FROM THE DEFENSE?

VIII.   WHETHER THE CUMULATIVE EFFECT OF THE ERRORS JUSTIFIES REVERSAL?

IX.    WHETHER DEFENDANT'S SENTENCES ARE CRUEL AND UNUSUAL BECAUSE THE MAXIMUMS EXCEED DEFENDANT'S LIFE EXPECTANCY?

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. McLouth*, No. 199310, 1999 WL 33435402 (Mich. Ct. App. Oct. 1, 1999) (per curiam).

5.      Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. McLouth*, 461 Mich. 1017, 622 N.W.2d 523 (2000).

6.      On April 20, 2001, petitioner filed an application for the writ of habeas corpus in this Court, raising two ineffective assistance of counsel claims and a claim that he was denied his right to confront the witnesses against him. After respondent filed an answer arguing that petitioner's application was unexhausted, petitioner filed a motion to dismiss the case without prejudice so that he could exhaust his state court remedies. The Court granted the motion on January 9, 2002.

7.      On September 22, 2003, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508. The trial court denied the motion on October 13, 2003, concluding that petitioner was seeking relief on grounds already decided in a prior appeal, and thus that relief was barred by MICH. CT. R. 6.508(D)(2). *See People v. McLouth*, No. 96-228-FC (Eaton County, Mich., Cir. Ct. Oct. 13, 2003).[1] The Michigan Court of Appeals and the Michigan Supreme Court both denied petitioner's applications for leave to appeal based on petitioner's "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. McLouth*, 471 Mich. 897, 688 N.W.2d 86 (2004); *People v. McLouth*, No. 252535 (Mich. Ct. App. Mar. 15, 2004).

8.      On March 8, 2005, petitioner filed an amended application for the writ of habeas

---

[1]Contrary to the Court's November 2, 2005, Order reopening this case, respondent has not filed the state court records relating to petitioner's motion for relief from judgment. The trial court's opinion is attached to petitioner's amended habeas application.

corpus. Petitioner raises six claims for relief: (1) ineffective assistance of counsel; (2) ineffective assistance of counsel based on counsel's failure to seek suppression of his statements; (3) denial of the right to confront the witnesses against him; (4) denial of substitute counsel; (5) denial of right to proceed *pro se*; and (6) denial of the right to an impartial jury.

9.      On November 2, 2005, the Court entered an Order reopening petitioner's case and requiring respondent to file an answer to the petition.

10.     Respondent filed her answer on February 10, 2006. Respondent argues that all but petitioner's second claim are barred by petitioner's procedural default in the state courts, and that petitioner's second claim is without merit.

B.      *Factual Background Underlying Petitioner's Conviction*

The evidence adduced at trial is accurately summarized in respondent's brief:

> On April 22, 1996, Arthur Kemmer answered the telephone at his home. The caller, a man named Shawn, later identified as Petitioner McLouth, was looking for Kemmer's Uncle Jay. (Tr. Vol. 1, p. 118). The reason for the call, McLouth stated, was to offer Jay a job remodeling houses. (Tr. Vol. 1, p. 118). During the conversation, McLouth offered to give Kemmer a job but said he would have to think about it because Kemmer was only 15 years old. (Tr. Vol. 1, p. 119). Later that evening, McLouth made another phone call to Kemmer during which he offered to put Kemmer to work remodeling houses. (Tr. Vol. 1, pp. 119-120). McLouth told Kemmer that he would need to sign some papers to be able to do the work and that he would stop by Kemmer's house with them later that evening. (Tr. Vol. 1, p. 120).
> Later that evening on April 22, McLouth arrived at the Kemmer residence. (Tr. Vol. 1, pp. 120-121). Kemmer's cousin, Maria Neil, answered the door and identified McLouth as the person who had come over to see Kemmer that evening. (Tr. Vol. 1, pp. 225-226). McLouth and Mr. Kemmer began discussing the remodeling work but since they were being repeatedly interrupted, they decided to finish their discussions at the office of the Village Green Apartment complex, where the remodeling work was supposed to be done. (Tr. Vol. 1, p. 122).
> During the ride to the apartment complex, Kemmer testified that McLouth gave him a bag of marijuana, which he kept, for "wasting time talking with him." (Tr. Vol. 1, p. 123). After this exchange the two of them proceeded to the apartment complex. (Tr. Vol. 1, p. 124). At the apartment complex, McLouth tried to open the door to the office but it was locked and he did not have a key. (Tr. Vol. 1, p. 124).

Kemmer testified that after they could not get into the office at the apartment complex, they proceeded to Sharp Park, next to the apartments, because McLouth stated that Kemmer needed to fill out papers for the remodeling job. (Tr. Vol. 1, p. 125).

Upon arriving at Sharp Park, Kemmer and McLouth sat on a bench near a pavilion so that the paperwork for the job could be filled out. (Tr. Vol. 1, p. 125). At trial Kemmer testified that the Petitioner had a "black planner book" with him when the two went to fill out the papers. (Tr. Vol. 1, p. 125). Kemmer testified that at this time the Petitioner started "changing up business" and spoke about an escort service. (Tr. Vol. 1, p. 126). At this time Kemmer started to get up and walk to the truck to leave the park. (Tr. Vol. 1, p. 127). Kemmer testified that when he started to leave, McLouth pinned him against the wall of the nearby pavilion so that Kemmer could not move. (Tr. Vol. 1, pp. 127-128). Kemmer again tried to leave the park but when he did so McLouth hit the victim in the back of the head with a closed fist "a couple of times" which caused the victim's head to bleed. (Tr. Vol. 1, pp. 128-130). Kemmer further testified that after being struck by the Petitioner, McLouth began to speak again of his "escort service" and said that Kemmer could be his "hooker." (Tr. Vol. 1, pp. 128-129). Kemmer told the Petitioner that he would not "do anything with him." (Tr. Vol. 1, p. 130).

Kemmer testified that after he had rejected the Petitioner's offer to "be his hooker" McLouth became angry, pinned him against the ground, and began to hit him again. (Tr. Vol. 1, p. 130). Kemmer tried to yell for help but the Petitioner grabbed him by the throat and testicles and "squeezed them both real hard" so that he would stop yelling for help. (Tr. Vol. 1, p. 130). Kemmer testified that the Petitioner hit him again and then pulled down the victim's pants, placed Kemmer's penis in his mouth and began sucking on it. (Tr. Vol. 1, pp. 130-131). The victim testified that when McLouth had stopped sucking his penis he told Kemmer that "I had to suck his penis because he sucked mine . . . [a]nd if I didn't, he was gonna break my neck." (Tr. Vol. 1, p. 131). On cross-examination, Kemmer testified that McLouth also put his mouth on the victim's testicles. (Tr. Vol. 1, pp. 187-188). Kemmer further testified that McLouth pulled down his pants and "pushed his penis in my mouth." (Tr. Vol. 1, pp. 131-132). When the Petitioner's penis was in Kemmer's mouth, the victim started to gag prompting McLouth to remove it and comment to the victim that he "wasn't ready for that yet." (Tr. Vol. 1, p. 133).

After removing his penis from the victim's mouth, Kemmer testified that McLouth let him up and, under threats that he would "break his neck," took him to the area of the park by the benches and forced the victim to masturbate him. (Tr. Vol. 1, p. 134). Kemmer testified that after being forced to masturbate the Petitioner, McLouth placed his testicles in the victim's mouth while he masturbated himself. (Tr. Vol. 1, pp. 134-135). The victim also testified that at some point when both he and the Petitioner had their pants down, McLouth had rubbed his testicles against Kemmer's buttocks. (Tr. Vol. 1, pp. 135-136). After the Petitioner had removed his testicles from the victim's mouth, Kemmer stated that he would dance for the Petitioner if he would let him go. (Tr. Vol. 1, p. 135). McLouth let the victim up and

Kemmer took the opportunity to pull up his pants and run to The Village Green apartment complex that they had been at before. (Tr. Vol. 1, p. 135). Although McLouth was charged with three counts, Kemmer's testimony detailed four separate acts which would fall under CSC I. (Tr. Vol. 1, pp. 130-135, 187-188.)

When Kemmer reached the apartments, he began to knock on the door of one of the apartments. (Tr. Vol. 1, p. 138). Kemmer first knocked on the door of Andrew Oser. (Tr. Vol. 1, p. 201). Oser testified that on April 22, 1996, at around 9:30 p.m. he heard knocking at his sliding glass door. (Tr. Vol. 1, p. 201). Oser looked out his curtains and saw someone standing outside. (Tr. Vol. 1, p. 201). This person, Arthur Kemmer, asked Oser to let him in the apartment because someone had tried to rape him. (Tr. Vol. 1, p. 201). Oser's testimony indicated that Kemmer seemed frightened and appeared to be looking in the direction of Sharp Park. (Tr. Vol. 1, pp. 202, 204). Oser did not let Kemmer in the apartment but did call 911. (Tr. Vol. 1, p. 201).

Kemmer then went to another apartment and knocked on the door. (Tr. Vol. 1, p. 139). The occupants of this apartment, Frank and Janis Kutas, let Kemmer in. (Tr. Vol. 1, pp. 139, 207, 217). When Mr. and Mrs. Kutas let Kemmer in their apartment he told them that a man had tried to molest him and immediately asked for something to wash out his mouth. (Tr. Vol. 1, p. 217). Mr. Kutas stated that when he let in the victim, Kemmer's clothing looked dirty and disheveled. (Tr. Vol. 1, p. 211). According to the testimony of Mrs. Kutas, Kemmer was given mouthwash and a washcloth to clean his wounds since he was bleeding. (Tr. Vol. 1, p. 217). Mr. Kutas' testimony indicated that when he asked Kemmer what had happened that night, the victim stated that a man had "made a pass at him," tried to kiss him, and made Kemmer masturbate him. (Tr. Vol. 1, p. 208). Kemmer also told Mr. Kutas that the attacker had tried to break his neck. (Tr. Vol. 1, p. 209).

Mrs. Kutas testified that when Kemmer came to their door he was "absolutely scared to death" and he told the couple that a man had attacked him in Sharp Park. (Tr. Vol. 1, pp. 216-217). Mrs. Kutas described the victim's clothing as dirty and messy when he came to the door. (Tr. Vol. 1, p. 218). She also testified that "practically the first thing he said was do you got something I can wash my mouth out with." (Tr. Vol. 1, p. 217). Mrs. Kutas gave him some mouthwash while her husband called the police. (Tr. Vol. 1, pp. 217-218).

As a result of Oser's call to 911, Deputy Gregory Crawford was dispatched to the Village Green Apartments. (Tr. Vol. 2, p. 24). Deputy Crawford interviewed Kemmer and determined that the case appeared to be a criminal sexual conduct case. (Tr. Vol. 2, p. 27). During the course of the interview, Kemmer gave Deputy Crawford the name "Shawn" as a possible name of his attacker. (Tr. Vo1. 2, p. 31).

When Deputy Crawford made the determination that this was a possible CSC, Detective Dan Prueter was contacted to respond to the case. (Tr. Vol. 2, p. 62). Detective Prueter, working with Deputy Crawford, developed the Petitioner Martin Shawn McLouth as a suspect in the case. (Tr. Vol. 2, p. 66). Detective Prueter then put together a photographic lineup, with a picture of McLouth in it, and took it to the home of Kemmer. (Tr. Vol. 2, p. 66-67). From the lineup, Kemmer identified McLouth as his attacker. (Tr. Vol. 2, p. 67-68).

Following the identification of the Petitioner from the photographic lineup, Detective Prueter obtained a search warrant on April 23, 1996, for McLouth's apartment. The affidavit listed items of clothing that, according to Kemmer, the Petitioner wore during the attack. The affidavit also listed items which could be used for identification purposes among those to be searched and seized. After obtaining the warrant, Detective Prueter went to the home of McLouth on April 23. (Tr. Vol. 2, p. 70).

Prueter was met at the apartment by Gregory Young, who told the detective that he was McLouth's roommate. (Tr. Vol. 2, p. 71). While at the apartment, Detective Prueter noticed a black planner on the kitchen table. (Tr. Vol. 2, p. 71). He asked Young who it belonged to and McLouth, who had emerged from another room in the apartment, said it was his. (Tr. Vol. 2, p. 71). The planner was seized pursuant to the warrant and McLouth, who Kemmer had stated was carrying a black planner on the night of the incident, was placed under arrest by Detective Prueter. (Tr. Vol. 2, p. 71). McLouth was then transported to the Eaton County Sheriff's office at the Delta substation by Deputy Devon Dixon. (Tr. Vol. 2, p. 71).

Detective Prueter also went to the Delta substation and interviewed the Petitioner. (Tr. Vol. 2, pp. 71-72). At the time of his arrest, the Petitioner had not been given his *Miranda* warnings. But, before interviewing McLouth, Prueter advised the Petitioner of his *Miranda* rights. (Tr. Vol. 2, p. 72). McLouth, however, stated at trial that he had been questioned before his *Miranda* warnings were given to him. (Tr. Vol. 2, p. 140).

After Prueter advised the Petitioner of his rights at the Delta substation, McLouth told him, with Detective Norman Kelley also present, that he was willing to give up those rights and speak with the detectives. (Tr. Vol. 2, p. 72). Although McLouth testified that he had taken an assortment of medication on both the day of the incident and the day of the interview, Detective Kelley testified that the Petitioner did not appear to be under the influence of any drugs or alcohol on the day of the interview. (Tr. Vol. 2, pp. 49, 115, 144). McLouth's willingness to give up his *Miranda* rights was evidenced by a written waiver of rights which the Petitioner signed, as did Detectives Prueter and Kelley.

During the interview with Prueter, McLouth admitted that he picked up Kemmer that evening. (Tr. Vol. 2, p. 76). McLouth stated that the reason for the meeting with Kemmer was to sell a bag of marijuana to the victim and they had gone to Sharp Park because McLouth did not want anyone to know where he lived. (Tr. Vol. 2, p. 76). McLouth told Detective Prueter that while they were at the park completing the drug deal, Kemmer did not have enough money to make the purchase. (Tr. Vol. 2, p. 77). McLouth told the detectives that this had angered him so he struck Kemmer. (Tr. Vol. 2, p. 77).

At this time, Prueter confronted the Petitioner about the sexual acts that the victim had described. (Tr. Vol. 2, pp. 77-78). McLouth said that the victim had agreed to masturbate in front of him as payment for the marijuana, but McLouth denied performing oral sex on the victim or forcing the victim to perform oral sex on him. (Tr. Vol. 2, pp. 77-78). McLouth told the detectives that although he had

engaged in sex with men before, he would never think of having sex with Mr. Kemmer because he was too young. (Tr. Vol. 2, p. 78). At this point the Petitioner said he no longer wanted to speak about the incident and declined to give a written statement to the detectives. (Tr. Vol. 2, p. 79).

Mr. McLouth was convicted of three counts of CSC I on September 17, 1996. (Tr. Vol. 2, pp. 192-193).

Answer, at 3-9 (footnote omitted).

C.    *Procedural Default*

Respondent first contends that petitioner's claims, with the exception of his second claim, are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal. The Court should disagree.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, petitioner presented his purportedly defaulted habeas claims in his motion for relief

from judgment. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." MICH. CT. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not. *See* MICH. CT. R. 6.508(D)(1)-(3).

The Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his "fail[ure] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. McLouth*, 471 Mich. 897, 688 N.W.2d 86 (2004); *People v. McLouth*, No. 252535 (Mich. Ct. App. Mar. 15, 2004). Looking at the structure of Rule 6.508(D), it would appear that this language indicates that petitioner failed to meet the substantive burden of entitlement to relief, rather than failed to comply with one of the procedural aspects of the rule. This, in turn, would not constitute an invocation of a state procedural default barring habeas review of petitioner's claims. Respondent, however, relies on the Sixth Circuit's decision in *Simpson v. Jones*, 238 F.3d 399 (6th Cir. 2000), in which the court held otherwise and concluded that this identical language constitutes an invocation of the procedural aspects of Rule 6.508(D), and thus bars federal habeas review. *See Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000).

Were *Simpson* the last word on the matter, this Court would of course be bound to follow the Sixth Circuit's holding. However, a more recent decision by the Sixth Circuit has limited the breadth of the *Simpson* rule, rendering it inapplicable here. In *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), the Court explained that its previous decisions in *Simpson* and *Burroughs v. Makowski*,

282 F.3d 410 (6th Cir. 2003), were based on the fact that the lower state courts in those cases had

expressly invoked the procedural aspect of Rule 6.508(D)(3), and therefore the court could be fairly

certain that the Michigan Supreme Court's citation to "MCR 6.508(D)" was intended as an

invocation of the procedural aspect of that rule. In *Abela*, however, the lower courts had addressed

the petitioner's claims on the merits, and this was enough to distinguish *Simpson* and *Burroughs*,

as the court explained:

> In short, unlike in *Simpson* and *Burroughs*, the state courts below the supreme court
> never invoked a procedural bar here, but rather repeatedly ruled on the merits. The
> procedural circumstances in this case are, therefore, materially different from those
> in *Simpson* and *Burroughs*, where the lower state courts actually invoked a
> procedural bar, making it clearer that the Michigan Supreme Court was also invoking
> such a bar when it referred to M.C.R. 6.508(D). But given that all of the lower state
> courts adjudicated Abela's case on the merits, it is not at all clear that the Michigan
> Supreme Court's summary order relies on a procedural bar, as opposed to the
> non-procedural reason that Abela simply failed to meet his burden of "establishing
> entitlement to the relief requested." Indeed, given the line of prior merits
> determinations in Abela's case, it is just as reasonable to presume that the Michigan
> Supreme Court's reference to M.C.R. 6.508(D) signaled its agreement with the lower
> courts' merits determinations as it is to presume that the reference signaled, for the
> first time in this case, the invocation of a procedural bar.
>
> In short, the procedural facts of *Simpson* and *Burroughs* are distinguishable
> from our case. The facts in *Simpson* and *Burroughs* inspired greater certainty that the
> Michigan Supreme Court actually relied on a procedural bar in rendering its
> judgment. No such clarifying indicators are present here. Moreover, *Simpson* and
> *Burroughs* do not purport to eviscerate our Circuit's rule that a state procedural rule
> is an "independent and adequate" state ground only if the state court rendering
> judgment in the case "clearly and expressly stated that its judgment rested on a
> procedural bar." *Sparkman*, 94 F.3d at 202. *Simpson* and *Burroughs* did not hold that
> we should divine procedural default from any and all references to M.C.R. 6.508(D)
> where such default may actually have occurred, but where the procedural history
> raises genuine questions as to the state court's actual reliance on a procedural bar.
> To suggest that those cases did so hold is to accept that they invert the inquiry into
> whether federal review of the habeas claims is permitted. That is, pursuant to *Maupin
> v. Smith*, 785 F.2d 135 (1986), whether the petitioner actually failed to comply with
> a procedural rule is only the predicate, not the ultimate, question before us. The
> ultimate legal questions are whether the court relied on and expressly invoked that
> procedural bar and whether it is an "independent and adequate" ground for
> precluding review. *See Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001). If a state

court is slurring its words, our job is not to guess what it might be saying, but rather to demand that it enunciate more clearly. Here, because of numerous factors--the Michigan Supreme Court's reference only to M.C.R. 6.508(D), the absence of a clear and express invocation of a procedural bar, and the plausibility, based on the prior state courts' merits rulings, that the Michigan Supreme Court, too, grounded its decision in a non-procedural reason based on Abela's failure to "establish[] entitlement to relief"--we cannot find that M.C.R. 6.503(D)(3), the state procedural rule urged by Respondent, was actually relied on by the Michigan Supreme Court in this case. For the same reasons, we cannot find that M.C.R. 6.503(D) constitutes an adequate and independent basis for the state supreme court's decision here.

*Abela*, 380 F.3d at 923-24; *see also*, *Williams v. Jones*, 231 F. Supp. 2d 586, 597 (E.D. Mich. 2002)

(Lawson, J.).

Here, as in *Abela*, the trial court did not reject petitioner's claims on the basis of his failure to raise those claims on direct appeal, *i.e.*, under the procedural rule set forth in Rule 6.508(D)(3). Rather, the trial court found that the claims raised had, in fact, already been decided against petitioner in his direct appeal and thus were barred by Rule 6.508(D)(2). Rule 6.508(D)(2) is merely a *res judicata* rule, and thus does not constitute a procedural default. *See Morse v. Trippett*, 102 F. Supp. 2d 392, 402 (E.D. Mich. 2000) (Tarnow, J.) (citing *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996); *Silverstein v. Henderson*, 706 F.2d 361, 368 (2d Cir. 1983)); *accord Correll v. Thompson*, 63 F.3d 1279, 1289 n.8 (4th Cir. 1995). Thus, in the legally relevant respects this case is identical to *Abela*, and under that decision petitioner's claims are not defaulted. Accordingly, the Court should conclude that petitioner's claims are not barred by a procedural default.

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.      *Right to Counsel (Substitute Counsel/Pro Se Representation)*

Petitioner contends that he was denied his Sixth Amendment right to counsel in two respects. First, he contends that the trial court denied him the right to counsel by failing to appoint substitute

counsel. Second, he argues that he was denied the right to proceed *pro se*. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.     *Counsel's Request to Withdraw*

Three days prior to trial petitioner's counsel, Todd Robinson, filed a motion to withdraw as counsel. Robinson indicated that, based on petitioner's disagreements with him on the adequacy of his work in the case, there was a breakdown in the attorney/client relationship. *See* Motions Tr., dated 9/13/96, at 3. The court then engaged in a long discussion with Robinson, petitioner, and the prosecutor regarding petitioner's concerns with counsel's performance, counsel's pre-trial preparation, and what petitioner thought needed to be done that had not been done by counsel. *See id.* at 3-41. The trial court then denied counsel's motion to withdraw. Noting the closeness of the trial date and the length of time the case had been pending, and concluding that Robinson's pre-trial preparation had been adequate, the court explained that it would not adjourn the trial date. *See id.* at 41. The court gave petitioner the choice of "proceed[ing] with Mr. Robinson at trial or you can act as your own attorney and you can use Mr. Robinson as a back-up or you can just be your own attorney." *Id*. Petitioner indicated that he could not proceed by himself and needed the assistance of counsel, but did not specifically indicate (and the court did not clarify) whether he wanted to proceed *pro se* with Robinson as stand-by counsel or rather have Robinson represent him. *See id.* at 44, 46-47. The trial court then allowed petitioner himself to argue various motions he had filed, although petitioner claims that the court did not allow him to act as his own attorney during the course of the trial.

2.     *Denial of Adjournment/Substitute Counsel*

Petitioner first contends that he was denied the right to counsel of his choice by the court's

failure to grant Robinson's motion to withdraw and to grant an adjournment so that he could have new counsel appointed. The Court should conclude that this claim is without merit.

### a. Clearly Established Law

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI. This right contemplates a corollary right to the counsel of one's choice, and thus a criminal defendant who has the desire and the financial means to retain his own counsel generally "'should be afforded a fair opportunity to secure counsel of his choice.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). However, "[a]lthough the Sixth Amendment contemplates a right to counsel of choice, that right is generally cognizable only to the extent defendant can retain counsel with private funds; an indigent defendant does not have an absolute right to choose appointed counsel." *Haynie v. Furlong*, No. 98-1177, 1999 WL 80144, at *1 (10th Cir. Feb. 17, 1999). As the Supreme Court has recently explained, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2565 (2006). Further, the right to counsel of one's choice is not absolute, and "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Importantly, the right to counsel of one's choice "must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988); *see also*, *Lockett v. Arn*, 740 F.2d 407, 413 (6th Cir. 1984) ("Although a criminal defendant is entitled to a reasonable opportunity to obtain counsel of his choice, the exercise of that right must be balanced against the

court's authority to control its docket.").  Further, as the Supreme Court has explained, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers."  *Wheat*, 486 U.S. at 159.  Thus, "in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'"  *Id.* (quoting *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984).

Because an indigent defendant has no absolute right to appointed counsel of his choice, and because the focus of the Sixth Amendment inquiry is on effective advocacy, "[a] criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant."  *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991); *accord United States v. Blaze*, 143 F.3d 585, 593 (10th Cir. 1998); *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990).   In determining whether the trial court erred in failing to appoint substitute counsel, a federal habeas court should consider: (1) the timeliness of the defendant's motion; (2) the adequacy of the trial court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense.  *See United States v. Allen*, 789 F.2d 90, 92 (1st Cir. 1986) (adopted by the Sixth Circuit for use in habeas cases in *Tolliver v. Dallman*, No. 94-3491, 1995 WL 364176, at *2 (6th Cir. June 16, 1995)); *see also*, *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999).

*b.  Analysis*

18

Here, petitioner failed to establish good cause for substitution of counsel, "such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *Smith*, 923 F.2d at 1320. Petitioner does not allege that there was any irreconcilable conflict between himself and counsel, or that counsel was acting with a conflict of interest. While petitioner does contend that there was a breakdown in communication, he does not allege the type of complete breakdown for which substitute counsel is warranted. Rather, petitioner contends only that counsel was unprepared and had not presented various motions which he thought should be brought. This is insufficient to constitute the type of complete breakdown justifying appointment of substitute counsel. *See United States v. Carillo*, 161 Fed. Appx. 790, 793 (10th Cir. 2006); *cf. Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) (there is no constitutional right to a "meaningful attorney-client relationship."). Further, petitioner's request came only three days prior to the scheduled trial date, and the trial court inquired extensively into the bases for petitioner's dissatisfaction with counsel. *See United States v. Johnson*, 961 F.2d 1488, 1491 (10th Cir. 1992). In these circumstances, petitioner was not denied his Sixth Amendment right to counsel by the trial court's failure to appoint substitute counsel.

3.      *Denial of Self-Representation*

Petitioner also contends that he was denied his right to proceed *pro se* at trial. The Court should conclude that this claim is without merit.

a.  *Clearly Established Law*

As noted above, the Sixth Amendment, applicable to the states through the Fourteenth Amendment Due Process Clause, provides that a criminal defendant shall have the right to the assistance of counsel in his defense. *See* U.S. CONST. amend. VI. This right necessarily implies its

corollary, that a defendant has a right to proceed without counsel and represent himself. *See Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 154 (2000); *Faretta v. California*, 422 U.S. 806, 833-34 (1975). The right to assistance of counsel and the right to self-representation are thus correlative rights; the assertion of one necessarily constitutes a waiver of the other. *See United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970). Nevertheless, a defendant's waiver of his right to counsel and decision to proceed *pro se* must be knowing and intelligent. *See Faretta*, 422 U.S. at 835; *Carnley v. Cochran*, 369 U.S. 506, 516 (1962). As the Supreme Court explained, in order for the defendant's decision to be knowing and voluntary, "he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

However, the right to self-representation is not absolute. *See Martinez*, 528 U.S. at 161. A defendant's request for self-representation must be made clearly and unequivocally. *See Buhl v. Cooksey*, 233 F. 3d 783, 792 (3d Cir. 2000); *Munkus v. Furlong*, 170 F. 3d 980, 983-984 (10th Cir. 1999). The right to self-representation is waived if it is not timely and unequivocally asserted. *See Jackson v. Ylst*, 921 F. 2d 882, 888 (9th Cir. 1990). The right to self-representation may also be waived through conduct which indicates that the defendant is vacillating on the issue or has abandoned his or her request altogether. *See Wilson v. Walker*, 204 F. 3d 33, 37 (2d Cir. 2000). A waiver of the right to self-representation may also be found if it reasonably appears to the court that the defendant abandoned his initial request to represent himself. *See id.*

*b. Analysis*

Here, petitioner's self-representation claim fails because he neither made an unequivocal

request to represent himself nor made an knowing and intelligent waiver of his right to counsel. Petitioner never unequivocally requested that he be permitted to represent himself. Petitioner's focus was not on representing himself, but rather on securing new counsel. If a defendant's motion for self-representation is ambiguous, and the surrounding circumstances suggest that it is a motion to substitute counsel rather than to proceed *pro se*, the court should construe the request as a request for substitution of counsel. *See United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994) ("Where a defendant merely expresses dissatisfaction with trial counsel's performance . . . we will not interpret this as a motion to proceed pro se; instead, it will be understood as an appeal to the trial court's discretion to substitute counsel."); *Perez v. Mashall*, 946 F. Supp. 1521, 1534 (S.D. Cal. 1996). Further, petitioner explicitly declined to proceed *pro se*, twice telling the court that he desired and needed the assistance of counsel. *See* Motions Tr., dated 9/13/96, at 41, 46-47. To the extent there was any ambiguity, the trial court was correct in ascribing a "constitutional primacy" to the right to counsel, because this right serves both the individual and collective good, as opposed to only the individual interests served by protecting the right of self-representation. *See United States v. Frazier-El*, 204 F. 3d 553, 559 (4th Cir. 2000).

Petitioner's principal argument is that he was not permitted during the trial to act as his own attorney in conjunction with appointed counsel. However, there is no constitutional right to "hybrid" representation by a *pro se* defendant and standby counsel together. *See United States v. Cromer*, 389 F.3d 662, 681 n.12 (6th Cir. 2004) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984)); *United States v. Bova*, 350 F.3d 224, 226 (1st Cir. 2003); *United States v. Einfeldt*, 138 F.3d 373, 378 (8th Cir. 1998). Thus, petitioner cannot show that he was denied his Sixth Amendment right to represent himself. Accordingly, the Court should that petitioner is not entitled to habeas

relief on this claim.

F.      *Ineffective Assistance of Counsel*

Petitioner next contends that his trial counsel rendered constitutionally deficient assistance in several respects. Specifically, he contends that counsel was ineffective for: (1) failing to adequately interview witnesses, communicate with him, and prepare for trial; (2) seek suppression of his statement to the police under both the Fourth and Fifth Amendments; and (3) allowing prosecution witnesses to be removed from the witness list. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689;

*see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

  2. *Analysis*

    *a. Preparation/Communication*

  Petitioner first contends that counsel was ineffective for failing to communicate with him and for failing to properly prepare for trial. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

  With respect to counsel's failure to communicate with him, petitioner concedes that his trial counsel met with him on several occasions prior to trial. *See United States v. Chavez-Marquez*, 66 F.3d 259, 262 (10th Cir. 1995). Petitioner merely contends that these discussions with counsel were not productive and that counsel did not take adequate notes. He has not, however, alleged that he suffered any specific prejudice from counsel's purported failure to communicate with him, and thus he is not entitled to habeas relief. *See Anderson v. Calderon*, 232 F.3d 1053, 1086 (9th Cir. 2000) (counsel not ineffective for failing to meet with defendant prior to trial where defendant failed to show he was prejudiced by lack of communication); *United States v. Wright*, 845 F. Supp. 1041, 1072 (D.N.J.), *aff'd*, 46 F.3d 1120 (3d Cir. 1994).

With respect to counsel's preparation, petitioner contends that counsel should have interviewed and presented his mother as a witness, who could have testified that the victim phoned petitioner at home seeking marijuana, and should have investigated his claim that, due to his medical condition and the medicine he was taking, he was unable to maintain an erection and thus could not have committed a sexual assault. Petitioner's mother, however, had no direct knowledge regarding the assault. Even if her testimony contradicted that of the victim on the some of the details, it would not have called into question the victim's testimony regarding the actual assault, particularly in light of the other corroborating evidence. As to the medical issue, counsel testified that he interviewed petitioner's roommate, who indicated that he had had a sexual relationship with petitioner and that petitioner had no problem maintaining an erection. *See* Remand Hr'g Tr., Vol. I, at 118. There were also letters written between petitioner and the roommate which indicated that petitioner had no problems performing sexually. *See id*. at 118-19. In light of this significant contradictory evidence, counsel made a reasonable strategic decision not to present petitioner's alleged impotence as a defense to the charges. *See McElvain v. Lewis*, 283 F. Supp. 2d 1104, 1119 (C.D. Cal. 2003). Further, petitioner cannot establish prejudice because even if they had been presented by counsel, "the medical records would have shown only that [petitioner] had been prescribed medication that can potentially cause impotency. The medical records could not have demonstrated that he was in fact on the medication or impotent at the time [of the sexual assault]." *Alexander v. Armontrout*, 985 F.2d 976, 979 (8th Cir. 1993). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Suppression of Statements

Petitioner next contends that counsel was ineffective for failing to challenge the admission

of his statements to the police on both Fourth and Fifth Amendment grounds. Petitioner also contends that counsel should have challenged the introduction of his date planner which was seized by the police at the time of his arrest. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Counsel did challenge petitioner's custodial statements to the police both on Fifth Amendment and voluntariness grounds prior to trial. However, petitioner refused to testify at that hearing, *see* Remand Hr'g Tr., Vol. I, at 116, and without petitioner's testimony there was no evidence to rebut the officer's testimony that the *Miranda* warnings were given and that the statements were knowingly and voluntarily made. Thus, counsel was not ineffective in connection with petitioner's Fifth Amendment challenge to the admission of his statements.

With respect to the Fourth Amendment issue, petitioner cannot establish that he was prejudiced by counsel's failure to seek suppression of his statements or the day planner on Fourth Amendment grounds. Petitioner argues that the police did not have an arrest warrant when they arrested him in his home, and that his arrest therefore violated the rule of *Payton v. New York*, 445 U.S. 573 (1980). In *Payton*, the Court held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." *Id*. at 576. Contrary to petitioner's argument, however, *Payton* does not prohibit all felony arrests inside the home. As the *Payton* Court explained, "[p]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id*. at 585. Thus, "the rule in *Payton* was designed to protect the physical integrity of the home." *New York v. Harris*, 495 U.S. 14, 17 (1990). In other words, "'*Payton* is grounded (as the Court put it) in "the breach of the entrance to an individual's home." That is, it is the otherwise unauthorized *entry* and not the arrest

which give rise to the warrant requirement.'" *United States v. Winchenbach*, 197 F.3d 548, 553 (1st Cir. 1999) (quoting 3 WAYNE R. LAFAVE, SEARCH & SEIZURE § 6.1(c), at 249) (emphasis by quoting court). Thus, consistent with *Payton* the police may "arrest an individual in his home, without an arrest warrant, as long as they are lawfully on the premises (by reason, say, of a search warrant) and probable cause exists." *Id.*; *see also*, *Russell v. Harms*, 397 F.3d 458, 466 (7th Cir. 2005) ("[P]olice executing a valid search warrant may arrest a resident found within the permissible scope of that search if the officers have probable cause to believe that the resident has committed a crime."); *Mahlberg v. Mentzer*, 968 F.2d 772, 775 (8th Cir. 1992); *cf. Payton*, 445 U.S. at 588 ("[A]n entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and sanctity of the home, and justify the same level of constitutional protection.").

Here, the police entered petitioner's home pursuant to a valid search warrant. Both that warrant and petitioner's arrest were supported by the complaint of the victim, which provided probable cause for both the search and the arrest. Because the police were lawfully in petitioner's home pursuant to the search warrant, and because they had probable cause to believe that petitioner had committed a crime, his arrest was permissible under *Payton*. Thus, any motion to suppress petitioner's statements as the fruit of an illegal arrest would have been futile, and counsel was not ineffective for failing to make such a motion. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Waiver of Witnesses

Finally, petitioner contends that his counsel was ineffective for waiving the appearance of certain witnesses who had been listed on the prosecutor's witness list. Prior to trial, the prosecutor sought to strike from his witness list Sergeant Doug Burkhardt, Deputy Catallo, and Deputy Devon

Dixon, arguing that these witnesses were cumulative to other witnesses in the case. *See* Trial Conference Tr., dated 9/5/96, at 3. Defense counsel indicated that he had no objection to the striking of these witnesses. *See id.* at 4. Although petitioner contends that counsel should have required the prosecutor to keep these witnesses, he offers no argument as to what favorable evidence the witnesses could have provided the defense. The officers were prosecution witnesses involved in the investigation of the crime who had only evidence which was cumulative to that presented by the other police witnesses. Petitioner made no showing in the evidentiary hearing in state court that these officers could have provided any favorable evidence, and he makes no argument here regarding any specific exculpatory evidence the officers could have provided. In these circumstances, petitioner cannot show that he was prejudiced by counsel's failure to object to the prosecutor's striking of these witnesses. *See Veal v. Cooper*, 936 F. Supp. 511, 514-15 (N.D. Ill. 1996) (internal quotation omitted) (citation omitted) (where a petitioner alleges that counsel was ineffective for failing to call additional witnesses, the petitioner must show that he was prejudiced by this failure by "producing or otherwise detailing the witnesses' testimony," and not by relying on speculation). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Right to Confront the Witnesses*

Petitioner next contends that he was denied his Sixth Amendment right to confront the witnesses against him. Although not entirely clear from petitioner's pleadings, it appears this claim is based on petitioner's inability to question the witnesses who had been stricken from the prosecutor's witness list. This claim raises no Confrontation Clause issue.

By its terms, the Confrontation Clause applies only to the witnesses at trial, and "a defendant

has no right to confront [a person] who provides no evidence at trial." *United States v. Francesco*, 725 F.2d 817, 822 (1st Cir. 1984); *accord Cooper v. California*, 386 U.S. 58, 62 n.2 (1967) ("Petitioner also presents the contention here that he was unconstitutionally deprived of the right to confront the witnesses against him, because the State did not produce the informant to testify against him. This contention we consider absolutely devoid of merit."). Because the witnesses did not give any testimony against petitioner at trial, the trial court's allowing the prosecutor to delete these witnesses from the witness list does not implicate the Confrontation Clause.

Rather, to the extent the failure of these witnesses to testify implicates the Sixth Amendment, it does so under the Compulsory Process Clause, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor[.]" U.S. CONST. amend. VI. The Compulsory Process Clause, as a general matter, "grants a criminal defendant the right to call witnesses that are 'material and favorable to his defense.'" *Wong v. Money*, 142 F.3d 313, 324 (6th Cir. 1998) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Unfortunately, the Supreme Court has provided little guidance on the exact contours of the Compulsory Process Clause. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 55 & n. 12 (1987) (noting that the Compulsory Process Clause has rarely been a factor in the Court's decisions). Nevertheless, some general principles do exist to guide the Court's determination. First, as a general matter the clause establishes, "at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Id*. at 56. Second, it is clear that the right to compulsory process is not absolute; thus, in certain circumstances a witness may be precluded from testifying as a sanction for defendant's failing to comply with a discovery

order, *see Taylor v. Illinois*, 484 U.S. 400, 410-14 (1988), and testimony is subject to general evidentiary rules such as those governing relevance and privilege, *see Washington v. Texas*, 388 U.S. 14, 23 n.21 (1967); *Smith v. Cromer*, 159 F.3d 875, 882 (4th Cir. 1998).

To the extent that petitioner claims he was entitled to question these witnesses as a matter of the Compulsory Process Clause, the claim fails. First, petitioner was not denied the court's assistance in locating these witnesses and assuring their appearance at trial. Rather, counsel waived their appearance, agreeing with the prosecutor that their testimony would have been cumulative. Further, as the Supreme Court has explained, "more than mere absence of testimony is necessary to establish a violation of the right [to compulsory process]." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 866 (1982). The Sixth Amendment does not provide a defendant the right to process for obtaining any witness, only "witnesses in his favor." U.S. CONST. amend. VI. "This language suggests that [a defendant] cannot establish a violation of his constitutional right to compulsory process merely by showing that [he was deprived of witnesses' testimony]. He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *Valenzuela-Bernal*, 458 U.S. at 867. Here, as noted in connection with petitioner's related ineffective assistance of counsel claim, petitioner has made no showing that these witnesses could have offered any favorable, material, and noncumulative evidence in support of his defense. *See Valenzuela-Bernal*, 458 U.S. at 873 (defendant must show that the evidence "would have been material and favorable in ways not merely cumulative to the testimony of available witnesses."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Right to Impartial Jury*

In his brief, petitioner lists as one of the grounds for relief a claim that he was denied his

right to an impartial jury.  However, nowhere in either his initial petition or his amended petition filed after his state court motion for relief from judgment does petitioner set forth the basis for this claim.  Nor does he set forth a legal or factual basis for the claim in any of the various briefs he has filed in this case.  The rules governing habeas applications require a petitioner to state with particularity the facts supporting his claims.  *See* Rule 2(c), Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254.  Because petitioner has failed to provide any facts relating to this claim or to apprise the Court of the basis for this claim, the claim must be dismissed.  *See Adams v. Armontrout*, 897 F.2d 332, 333-34 (8th Cir. 1990); *Smith v. Jackson*, No. 04-CV-40256-FL, 2006 WL 950269, at *2 (E.D. Mich. Apr. 12, 2006) (Gadola, J.).

I.      *Conclusion*

        In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

        The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis*

*v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


S/Paul J. Komives
Paul J. Komives
United States District Judge

Dated: November 15, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 15, 2007, by electronic and/or ordinary mail.

S/V. Sims for Eddrey Butts
Case Manager